STATE OF LOUISIANA

VERSUS

KEMON JOSHUA HOWARD AKA "TUT" AKA
"GLOCKBOY TUT" AKA "GLOCKBOY"

NO. 24-KA-145

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 21-3041, DIVISION "N"
HONORABLE STEPHEN D. ENRIGHT, JR., JUDGE PRESIDING

December 18, 2024

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, and Marc E. Johnson

**AFFIRMED**
   **JGG**
   **SMC**
   **MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
 Honorable Paul D. Connick, Jr.
 Thomas J. Butler
 Monique D. Nolan
 Brittany Beckner
 Carolyn Chkautovich

COUNSEL FOR DEFENDANT/APPELLANT,
KEMON JOSHUA HOWARD
 Jane L. Beebe

DEFENDANT/APPELLANT,
KEMON HOWARD
 In Proper Person

**GRAVOIS, J.**

Defendant, Kemon Joshua Howard, appeals his conviction for second degree murder, a violation of La. R.S. 14:30.1. On appeal, in brief, defense counsel argues that the evidence was insufficient to convict defendant of the crime, and that the trial court erred in denying defendant's motion for a mistrial. Defendant filed a *pro se* supplemental brief with this Court, arguing that he received ineffective assistance of counsel at trial. We find no merit to the counseled assignments of error. We further find that defendant's *pro se* claims of ineffective assistance of counsel are more properly addressed in an application for post-conviction relief. We affirm defendant's conviction and sentence.

## PROCEDURAL HISTORY

On May 27, 2021, a Jefferson Parish Grand Jury returned an indictment charging defendant, Kemon Joshua Howard a/k/a "Tut" a/k/a "Glockboy Tut" a/k/a "Glockboy," with the second degree murder of Ronnie Brown on January 24, 2021, in violation of La. R.S. 14:30.1. Defendant was arraigned on July 1, 2021 and pled not guilty.[1]

On November 13, 2023, a twelve-person jury was selected. On November 15, 2023, the jury unanimously found defendant guilty as charged.

On December 1, 2023, defendant filed a Motion for New Trial. At a hearing on December 12, 2023, the motion was denied. After waiving statutory delays, defendant was sentenced to life imprisonment at hard labor with the possibility of parole.[2]

---

[1] Other pretrial matters are not addressed herein because they were not raised on appeal.

[2] Because defendant was seventeen years old at the time of the offense, he was sentenced in accordance with La. C.Cr.P. art. 878.1 and La. R.S. 15:574.4(E), both of which provide procedural guidelines for parole eligibility regarding offenders who commit first or second degree murder when they were under eighteen years of age. *State v. Garrison*, 19-62 (La. App. 5 Cir. 4/23/20), 297 So.3d 190, 211, *writ denied*, 20-547 (La. 9/23/20), 301 So.3d 1190, *cert. denied*, -- U.S. --, 141 S.Ct. 2864, 210 L.Ed.2d 967 (2021). *See Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 2466, 183 L.Ed.2d 407 (2012).

Defendant filed a Motion for Reconsideration of Sentence and a Motion for Appeal on December 19, 2023. The Motion for Appeal was granted on January 9, 2024. The Motion for Reconsideration of Sentence was denied on January 25, 2024.[3]

## FACTS

On January 24, 2021, defendant and the victim, Ronnie Brown, met up at the parking lot of the Terrytown library to allegedly trade or sell a gun. Defendant and Mr. Brown were childhood friends, according to Shakyla Swanigan, who had dated Mr. Brown for three years, and who was present at the shooting.[4] At the meet-up, defendant approached Mr. Brown and Ms. Swanigan, who were in a car, and after a greeting, opened fire on Mr. Brown, who was eventually pronounced dead at the scene. While she had not met him before, Ms. Swanigan was familiar with defendant, whose nickname was "Tut," from video calls and social media. Ms. Swanigan identified defendant, Kemon Howard, as "Tut" in open court.

The day before the incident, Ms. Swanigan, Mr. Brown, and a friend of his went to the Oakwood Mall on the Westbank to pick up defendant. However, they left because defendant never answered his phone. On the morning of the incident, Ms. Swanigan and Mr. Brown left their house in a silver Hyundai. She testified that Mr. Brown had a black handgun that day that he had acquired a week or two prior and he carried it for protection. The gun was between the center console and the driver's seat.

---

[3] The district court retained jurisdiction to take action on defendant's properly filed Motion for Reconsideration of Sentence after the Order of Appeal was entered. *See* La. C.Cr.P. art. 916(3); *State v. Sly*, 23-60 (La. App. 5 Cir. 11/2/23), 376 So.3d 1047, 1059, *writ denied*, 23-1588 (La. 4/23/24), 383 So.3d 608.

[4] In January of 2021, Ms. Swanigan was in eleventh grade; Mr. Brown was in twelfth grade and was nineteen years old. According to her testimony, they lived together on the Eastbank of Jefferson Parish.

Mr. Brown drove them to a library on the Westbank.[5] They pulled in and smoked. Mr. Brown called defendant, but he was not answering. As they were about to pull off, defendant called and asked Mr. Brown where he was. Mr. Brown said that he was waiting, and defendant said he was on his way. Defendant asked Mr. Brown who was with him, and he replied he was with "his girl." Mr. Brown "flipped the camera on" her and she batted it away. Defendant said he was on his way and hung up.

Ms. Swanigan testified that she was in the front passenger seat of their car. At that time, Mr. Brown's gun was under his leg. Defendant messaged that he saw them. Ms. Swanigan turned to Mr. Brown and asked if he was going to let defendant in. As they pulled up to the curb, defendant was standing on Ms. Swanigan's side of the car. Ms. Swanigan recalled that defendant told someone behind them to go around because he was getting in the car. When defendant walked to the driver's side of the car, he had his hands in his pockets. Mr. Brown rolled down his window and told defendant to get in the back. At that time, Ms. Swanigan saw defendant's face again. Ms. Swanigan testified that when defendant walked to the driver's side of the vehicle, Mr. Brown was smoking, and his hand was not on his gun.

Ms. Swanigan said that defendant "flinched for the back" like he was going to get in the back seat of the car, but instead he started shooting through the open driver's door window. She could not recall how many shots were fired, but stated she "saw beaucoup fire." She recalled that defendant was "in [Mr. Brown's] window" when he fired. Mr. Brown used his body to shield her. Mr. Brown then exited the vehicle via the back seat. He ran up the street and stopped a car. Their car was still moving, so Ms. Swanigan attempted to put it in park, but could not.

---

[5] The Terrytown Library branch and the Terrytown Playground are across the street from each other on Heritage Avenue in Terrytown.

Ms. Swanigan then "got out the window" and shot at defendant with Mr. Brown's gun. Mr. Brown ran back toward Ms. Swanigan. She fired one shot before the gun jammed. When she could not unjam the gun, she threw it and jumped out of the car. She clarified that she fired the gun before the car hit a pole. After she was out of the car, Mr. Brown ran towards her. He was unable to speak. Ms. Swanigan testified that Mr. Brown never had a chance to grab or fire his gun.

Several 9-1-1 calls were played for the jury. In one, the caller relayed that he heard four shots fired near the Terrytown Playground. He conveyed that a man collapsed in the street and that a silver car hit a pole. He saw a black male wearing all black run to the back of the playground. In another call, the caller reported that people shot each other at the Terrytown Playground and that a man was on the ground. A third caller relayed that a man was "down" in front of the library. He stated the man was breathing and was getting up occasionally. The caller did not see what had happened.

In another call, a man identified as Axel said there was a shooting in front of the Terrytown Playground. The shooter was black and wore a black jacket and silver pants. A woman got on the phone and related that there were two men shooting at each other. She said a male in a white hoodie got out of the back and shot at the black male. They both ran and that the driver was shot. A man then interjected that the driver got out and also fired. The woman said that the black male in the white hoodie ran toward the playground and that the other man ran between the houses. The man said that he was stopped on the road behind them and that a guy told him to go. The man then went to the driver-side window and started shooting. The driver got out and shot back. In another 9-1-1 call, a man conveyed that there was a shootout near the Terrytown Library.

Sergeant Dayton Greenwalt with the United States Marines was in the area of the Terrytown Library just before 10:00 a.m. on January 24, 2021. As he was

driving by, he noticed a man in a black hoodie standing near a car engaged in what appeared to be a normal conversation with the male driver. He then heard gunshots and turned into the parking lot. Sergeant Greenwalt looked in the direction of the sound and saw a man running. A man exited the vehicle, and Sergeant Greenwalt called 9-1-1.[6] A female then exited the car.

Timothy Cook worked for the parks and recreation department of Jefferson Parish at the Terrytown Playground. Just before 10:00 a.m. on January 24, 2021, Mr. Cook was sitting outside while there was a volleyball tournament going on at the gym when he heard what sounded like three or four fireworks going off in the direction of the library. Mr. Cook got everyone inside and called 9-1-1. He stated the sound came from the vehicle "the guy got shot in." Mr. Cook saw one man jump out of the driver's side of the car. He thought two people got out of that side, one from the back and one from the front, because that was where they came from. One man stumbled across the street as the other man walked past him between the tennis courts and building. Mr. Cook said "the girlfriend" exited the passenger side of the car once it hit a pole. Mr. Cook described the man that passed him as wearing a black hoodie and black track pants with a white stripe down the side.[7] A co-worker saw that man jump a fence by an elementary school.

Dan Vu was also in the area that morning. He stated that as he approached the library, the cars slowed down and then stopped. He saw two guys cross the street and get into a car. They were talking and appeared to be friends. Initially, a man in a hoodie spoke to the people in a car like they knew each other and were laughing. Mr. Vu said that they then argued, and he heard a firework or gunshot.

---

[6] In his 9-1-1 call, Sergeant Greenwalt said someone was shot near the Terrytown Library and was dead in the street. He stated there was a female with the victim. He said that a tall, skinny, black male in a hoodie ran away and that a vehicle crashed. He relayed that a man on the sidewalk appeared to be about to cross the street and appeared to be talking to the vehicle's occupants. He said the man on the sidewalk, whom he assumed was the shooter, indicated for others to go around them.

[7] Mr. Cook testified that the man had his hood up and he could not see his face.

He pulled over near the corner of the library and called 9-1-1. After he heard gunshots, he saw people running around and screaming. He saw two men come across the street. Mr. Vu testified that a person in a gray hoodie and black pants took off quickly and had something, possibly a t-shirt, wrapped around his right hand hiding something.[8] The person in the hoodie walked past Mr. Vu and looked at him, but Mr. Vu could not remember his face.

After the police arrived, Ms. Swanigan called Mr. Brown's sister, Ronisha, and his mother. Ms. Swanigan told Ronisha that "Tut" killed Mr. Brown and sent her their location.[9] EMS arrived and tried to check on her because she had Mr. Brown's blood on her. She directed EMS to Mr. Brown, and EMS ultimately told her that he did not make it.

Detective Richard Boykin with the Jefferson Parish Sheriff's Office ("JPSO") was in the area of the Terrytown Library around 10:00 a.m. that day. He testified that he heard pops similar to gunshots or fireworks as he was typing a report. He was alerted that there was an incident down the street. He pulled onto Heritage Avenue and saw a vehicle that appeared to be off the roadway. A hysterical female was standing next to the vehicle and a man was lying face down in the street. Detective Boykin rolled the man over and saw that he had sustained

---

[8] Initially, Mr. Vu did not remember telling the police that he did not see anything in the hand of the person in the hoodie. He then read aloud a portion of his statement wherein he answered negatively when the police asked him if he saw anything in his hand. Mr. Vu clarified that the police asked him about a man in the gray hoodie that came across the street. He said when the person came across the street, he did not see anything. After the shooting, he saw the person hiding something in his hand.

[9] Ronisha Brown, Ronnie Brown's sister, recalled that she had heard of Ronnie's friend, "Tut," and that they were childhood friends. Ronisha testified that her brother was nineteen or twenty when he was killed. She said that Ms. Swanigan called her the day her brother was killed and told her that "Tut" had killed him. Ms. Swanigan sent Ronisha her location. Ronisha testified that Ms. Swanigan did not say anything about Mr. Brown pulling a gun on defendant.

Ronisha then went through her brother's Instagram account, which he was already logged into, on a device she had. She saw a conversation between her brother and someone identified as "Glockboy Tut." She recalled that they discussed where he was and who he was with. There was also a record of a video chat. Ronisha testified that as she was going through the messages, defendant was erasing them, and it appeared as if Mr. Brown was conversing with himself. Sergeant Zeagler similarly testified that Mr. Brown's brother told him that he had access to Mr. Brown's Instagram and that he saw defendant deleting messages.

several gunshot wounds to the face, arm, and hand. He rendered aid to the man until EMS arrived, at which time he secured the scene.

Detective Boykin interviewed Ms. Swanigan, who told him that she and Mr. Brown arrived at the library, parked, and told defendant that they had arrived. A short time later, defendant arrived. Ms. Swanigan then heard gunshots and saw defendant pointing a gun into the driver's side of the vehicle. The vehicle then rolled until it struck a light pole. Ms. Swanigan stated that the victim was in the street and that she began to run toward him. Additional gunshots were fired, and the victim fell into the street. Ms. Swanigan retrieved a firearm from the car and unsuccessfully attempted to fire back, but the gun malfunctioned.[10] Detective Boykin stated he then arrived at the scene. Ultimately, homicide detectives arrived at the scene and took over the investigation.

Detective Scott Bradley, a homicide detective with the JPSO, responded to the crime scene to assist JPSO Detective Kurt Zeagler, who was the lead investigator. In crime scene photographs, Detective Bradley identified the silver vehicle the victim arrived in that later struck a light pole. The detective identified a photograph showing marijuana in the victim's pocket and testified that a black ski mask inside the hood of the victim's jacket was seized.[11]

Detective Bradley testified that there was suspected blood on the victim's vehicle and on a brick partition. There was a blood trail in the library parking lot and back toward the scene. After he watched surveillance footage, the detective determined that it was the victim's blood as he walked around after being shot (the victim exited his vehicle, went through the parking lot, and crossed the street where he eventually collapsed). On the surveillance video taken from the library,

---

[10] Ms. Swanigan remembered telling an officer that the gun jammed before she could fire it even though she knew she had actually shot it.

[11] Ms. Swanigan testified that she and Mr. Brown smoked marijuana and that he would sell it when someone asked him for some.

he saw the victim's car roll down the street and crash into the pole after he was shot. The victim was not in the car at that time, but his girlfriend, Ms. Swanigan, was. The surveillance video did not show any shooting past the pole or vehicle, but there was a Hornady casing (evidence marker E) found in front of the vehicle. A Hornady 9 mm fired cartridge casing (evidence marker H), a Winchester 9 mm fired casing (evidence marker A), and a Winchester unfired live round (evidence marker B) were also recovered. Detective Bradley testified that he believed the casing identified as evidence marker H was the first shot fired. Ballistics analysis determined that the casings in evidence markers E and H, which were the same brand, were fired from the same gun.

A malfunctioned Springfield Armory 9 mm firearm with a magazine was found under the tire of the victim's vehicle and had blood on the barrel.[12] The gun, which was stolen,[13] and magazine could hold up to twenty rounds, but only contained eleven rounds with two misfeeds. During the investigation, the detective learned that the recovered gun only fired the casing identified as evidence marker A found at the scene. Detective Bradley stated that the unfired cartridge casing (evidence marker B) was the same ammunition as evidence marker A.

Detective Bradley narrated as the library's footage was played.[14] The victim's vehicle arrived in the parking lot and parked. At some point, the victim

---

[12] Ms. Swanigan acknowledged that when she was speaking to the police at the scene, she saw the gun and kicked it under the tire because she was worried that she would get in trouble.

[13] Sergeant Zeagler stated that the gun the victim had at the scene was stolen during a car burglary. The sergeant agreed that there was no evidence that Mr. Brown stole the gun and that he bought and sold guns on the street.

[14] The footage from the library was admitted into evidence. This exhibit contains multiple videos from nine different cameras. Camera 2 event 20210124095528002 shows a person in a dark, pulled-up hoodie with white on the left chest area and black pants walk by. Shortly after the person is out of the frame, the victim's car appears to drive by while a woman with a purple shower cap hangs out of the driver's window aiming a gun behind the car. The car then hits a pole. A man in a white hoodie and black pants then runs toward the car. It appears the woman and man interact by the driver's door. The man then crosses the street, and the woman follows him. He falls down and gets up several times before ultimately collapsing in the street. Camera 2 event 2021012400028002 shows the initial officer at the scene and the victim on the ground. A silver truck drives past them as a second officer arrives. A woman in a shower

left the parking spot. Defendant approached the vehicle from the rear. The victim exited the rear passenger door, ran around the parking lot across the street, and then fell face down in the street. The library's footage shows defendant wearing a black hoodie with white insignia and blue shoes. The video showed the victim's girlfriend, who was wearing a blue jacket and a purple item like a shower cap or hat on her head, exit the driver's side of the vehicle with a gun, later recovered under the vehicle, in her hand. The footage also showed the car crash into the pole and the victim running toward the vehicle. The detective noted that multiple cars drove through the scene before the police and paramedics arrived.

Sergeant Zeagler reviewed video footage taken from a nearby residence. It depicted three gunshots in rapid succession followed by another gunshot. The sergeant explained that the first three shots were fired before the victim exited the car and that the last shot was fired after he exited the back seat.[15] Defendant was across the street fleeing at the time the last shot was fired. Sergeant Zeagler also reviewed the video footage from the library previously reviewed by Detective Bradley. It showed the victim's vehicle after the victim exited and Ms. Swanigan hanging out of a window pointing a gun.

Detective Bradley said that casings at a scene can be disturbed by vehicles. Two casings from the murder weapon were found at the scene, but the victim was shot more than twice. The casings at the scene that were not fired from the victim's gun (evidence markers H and E) were consistent with a Glock handgun. He further testified that there were various ways the Glock casing identified as evidence marker E could have moved.

---

cap is near the driver's side of the vehicle as multiple officers tend to the victim. One officer then speaks to the woman. Multiple police vehicles drive past the victim and the car.

[15] The video surveillance footage from the library shows a figure in dark clothing standing near a curb. A light-colored car pulls up, and the figure appears to approach the passenger side before crossing behind the vehicle to the driver's side as another vehicle goes around them. Three shots can be heard as the figure leaves. The vehicle appears to move as another shot is fired. The vehicle then hits a pole, and someone screams.

Sergeant Zeagler instructed officers at the scene to seize the vehicle and tow it to the crime lab. Detective Steven Keller with the homicide division of the JPSO was involved in the search of that vehicle.[16] They found that the front passenger-side bumper was dislodged from the vehicle's body. The front driver-side window was down, none of the windows were broken, and there was red matter consistent with blood on the exterior of the driver-side door, the driver's seat, the side/back of the front passenger seat, and the rear seats. The placement of the suspected blood was consistent with the victim exiting the back seat. No projectile defects or casings were inside the vehicle.[17]

Emily Terrebonne was accepted as an expert in firearm and toolmark examination and identification. Ms. Terrebonne sketched the scene and authored a ballistics report. Ms. Terrebonne examined three cartridge casings from the scene. She explained that typically, a casing is ejected to the back and to the right.[18] She confirmed that the fired cartridge identified as evidence marker A was fired from the Springfield pistol found under the vehicle. That fired cartridge and the unfired cartridge were both Winchesters. Ms. Terrebonne viewed the Springfield pistol and stated it did not have any damage.

Ms. Terrebonne testified that there were also two 9 mm Hornady cartridge casings that were fired from a gun which was consistent with a Glock pistol. Ms. Terrebonne testified that it was possible for the casings at a scene to be separated as they were here. She agreed that the scene was consistent with a gun being fired into the car, the casing lying on the car as it rolled, and then the casing falling forward. She further said that the scene was consistent with original gunfire, cars

---

[16] Detective Keller explained that a search warrant was not needed because the vehicle was stolen, which was confirmed by Sergeant Zeagler's testimony. Mr. Brown bought the car and was not suspected of stealing it.

[17] The vehicle was dusted for fingerprints. Prints belonging to an uninvolved individual, Jermaine Bigham, were found on the exterior rear passenger door.

[18] Detective Bradley explained that a Glock also ejects a casing to the right.

moving, return fire by a different gun, the car moving, a gun jamming, the car crashing into a pole, and the casing that was on top of the car rolling off.

Ms. Swanigan was transported to the investigation's bureau. As she was being transported to the bureau, she was told that the police knew the gun had been fired. She then acknowledged that she had fired the gun.

Sergeant Zeagler stated that during an initial conversation, Ms. Swanigan told Sergeant Zeagler that she and Mr. Brown went to the Westbank to meet his childhood friend whom she knew as "Tut." Ms. Swanigan gave him a sufficient enough description of "Tut" that he ran the information through law enforcement databases and identified defendant as "Tut." He compiled a six-person photographic lineup that included defendant.

Sergeant Zeagler then obtained a formal statement from Ms. Swanigan. At that time, he presented her with the photo array, and she immediately identified defendant as the person that shot and killed her boyfriend.[19] Ms. Swanigan provided the sergeant with Mr. Brown's cell phone, for which he obtained a search warrant and submitted it to the JPSO digital forensics unit.

Sergeant Zeagler obtained an arrest warrant for defendant. Detective Keller and Sergeant Zeagler located defendant in the parking lot of the Juvenile Justice Complex, where defendant was taken into custody. Defendant's mother had his phone in her car as phones were not allowed in the complex, and she surrendered it to Sergeant Zeagler. At the time of his arrest, defendant did not have any injuries. Sergeant Zeagler obtained a search warrant for the phone and submitted it to the JPSO digital forensics unit.

Defendant was brought to the investigation's bureau, joined by his mother. Defendant and his mother spoke to each other while there. The recorded

---

[19] Sergeant Zeagler testified that he presented a photographic lineup to Mr. Vu, but he was unable to identify anyone as the shooter.

conversation was admitted into evidence and a portion of it was published to the jury. Sergeant Zeagler testified that in the recording, defendant did not say that he fired in self-defense, but rather said that he had no idea what they were talking about.[20] Sergeant Zeagler testified that there was no evidence to suggest that defendant fired in self-defense.

Detective Dustin Ducote with the digital forensics' unit of the JPSO testified that he extracted data from defendant's iPhone[21] and the victim's iPhone. Sergeant Zeagler reviewed those extractions. Search warrants were obtained for the victim's ("17Shots") and defendant's ("Glockboy Tut") Instagram accounts. Sergeant Zeagler compared the cell phone extractions and Instagrams, and he reviewed several screenshots from those items.[22] He read an Instagram message exchange between the victim and defendant from January 24, 2021, at 9:37 a.m. The victim first said he was on his way. Defendant responded in the affirmative and was asked, "WYA."[23] At 9:49 a.m., defendant replied that he was walking through "the jets"[24] and the victim stated he was here. Defendant again responded affirmatively. Sergeant Zeagler testified that defendant asked the victim who was with him, and the victim responded, "Girl" and "I told you."

---

[20] The video was played starting at ten minutes and nineteen seconds through seventeen minutes and thirty-eight seconds. It was muted for four seconds starting at twelve minutes and nineteen seconds. The video was stopped at seventeen minutes and thirty-eight seconds.

In the video, defendant's mother asks him why there is a warrant for his arrest for a homicide. He states he does not know. Defendant repeatedly expresses that he did not know anything about what was going on and denies any involvement in a homicide. Defendant and his mother discuss the officers asking for defendant's phone. When his mother asks why he would be questioned about a homicide, defendant replied that he had no idea. Throughout the clip, defendant repeatedly denies hearing anything, knowing anything, or even being in the area of a homicide.

[21] Detective Ducote explained that there were three Apple IDs associated with the phone: Glockboytut5600@gmail.com, Glockboy5600@icloud.com, and Kemharris2001@icloud.com. The name of the phone was "Tut's iPhone." The Instagram was associated with Kemonhoward@gmail.com.

[22] Sergeant Zeagler said that defendant's Instagram records contained news articles about this murder.

[23] Sergeant Zeagler said he understood this to mean, "Where you at?"

[24] Sergeant Zeagler explained that "the jets" are a set of apartment buildings on Faith Place in Terrytown immediately around the corner from the scene of the murder.

---

Around 9:51 a.m., defendant messaged, "Just asking, you know, you probably bringing your whole squad." The victim asked, "for what." Defendant responded that he did not know and that the victim asked if he was on something. At 9:52 a.m., defendant told the victim he was alone. The victim replied, "I'll owe you a hundred if it's good, huh?" (Sergeant Zeagler stated the victim and defendant were there to "barter in stolen guns.") Defendant replied affirmatively. At 9:53 a.m., the victim told defendant that he was there. At 9:54 a.m., defendant video-called the victim for approximately two minutes.

Sergeant Zeagler testified that the phone and Instagram records established that the victim and defendant knew each other prior to the murder. Detective Ducote stated that there were also conversations between the two that predated the murder. Instagram messages found on the victim's phone from August 29, 2020 reflected a disagreement between him and defendant. Sergeant Zeagler agreed that based on the messages, it appeared the victim and defendant feuded for approximately one month in 2020.

On November 27, 2020, defendant texted the victim, "trade some." Further messages indicated that defendant was trying to trade a Sig forty caliber handgun. Sergeant Zeagler said it appeared the victim and defendant had moved past whatever feud they had. The sergeant reviewed another message from defendant indicating that he was trying to trade or get rid of the gun. On December 19, 2020, defendant messaged the victim that he only had a hundred and five on him, and the victim asked where he was. Three days later, the victim messaged defendant. On December 26, 2020, the victim asked defendant if he was good, and defendant answer affirmatively. Defendant then relayed that someone was looking for a Glock. Sergeant Zeagler stated that there was evidence other than the messages that suggested the victim was involved in selling or trading firearms.

Sergeant Zeagler identified photographs of defendant walking up to the scene taken from the Terrytown Library's surveillance video. Photographs found on defendant's phone showed him wearing the same distinctive shoes and jacket as seen in the library's footage. In one such photograph taken four days before the murder, defendant held a Glock handgun with an extended magazine.[25] Sergeant Zeagler identified a photograph posted to defendant's Instagram account the night before the murder of defendant holding a handgun that the sergeant described as a Glock with an extended magazine, taken at the intersection of Faith and Farmington Streets.

In his report, Sergeant Zeagler stated Mr. Brown exited the vehicle from the driver's side, but that he actually exited from the passenger side. He learned that Ms. Swanigan exited the car after it hit the pole. Ms. Swanigan acknowledged that she fired a shot before the gun malfunctioned, which was confirmed by video. The ballistics analysis confirmed that two guns were fired at the scene. Sergeant Zeagler testified that he believed Mr. Brown drove the vehicle based on all of the evidence, and that Mr. Brown exited the rear passenger seat and that blood in the vehicle showed that he traveled from the front seat, between the seats, and out the back passenger side.

Dr. Dana Troxclair, a forensic pathologist at the Jefferson Parish Coroner's Office, conducted an autopsy of Mr. Brown.[26] She testified that Mr. Brown's cause of death was multiple gunshot wounds, and his manner of death was a homicide. She recovered a projectile from Mr. Brown's right chest, right wrist,

---

[25] Detective Ducote reviewed the same photographs. He testified that three photographs of evidentiary value were extracted from defendant's phone, which were of defendant and it appeared he was holding a Glock.

[26] Dr. Troxclair testified the Mr. Brown's toxicology results indicated that he had recently smoked marijuana.

and left thigh, which was from an unrelated injury.[27]  She located six wounds, including entry, exit, and graze wounds.  Some of Mr. Brown's wounds could have been from the same bullet entering and exiting a second time.  Stippling indicated that one wound was from an intermediate range of two to three feet away and the others were distant wounds.[28]  She said that the trajectory could be consistent with someone shooting from above.

Dr. Troxclair agreed that the shots to the arm were consistent with a bent arm and that the wounds to the right hand could be consistent with someone holding a gun.  One injury was consistent with the shooter being behind the victim, another was consistent with the shooter being in front of the victim, and yet another was consistent with the shooter being on the left side of the victim.  She further found that the injury could be consistent with someone inside the vehicle "crouching through the seats" looking out of the driver-side window being shot by someone shooting inside the vehicle from the outside or someone seated in the driver's seat firing outside of the car.

Ms. Terrebonne received a copper jacketed projectile from the coroner's office, which she learned was from an earlier unrelated incident.  Two other copper jacketed projectiles were also recovered from the victim.  Ms. Terrebonne determined that the two relevant projectiles were both 9 mm and fired from the same weapon, which was consistent with a Glock.  She said that a firearm was not given to her to compare to evidence markers H and E.  She concluded that the projectiles from the victim's body and the casing from the scene were both consistent with a Glock.

---

[27] Ms. Swanigan testified that Mr. Brown had been shot in the leg when he was fourteen years old.

[28] Stippling occurs when the gun is fired at close range, causing burning gunpowder and debris to create small abrasions around the main entrance wound.

## ASSIGNMENT OF ERROR NUMBER ONE

### *Sufficiency of the Evidence*

In her brief to this Court, defense counsel contends that the State did not present sufficient evidence to convict defendant of murder. She states that the only question in this case was whether defendant felt threatened to such a degree that he had to stand his ground in self-defense. She asserts that defendant was outnumbered and did not expect Mr. Brown to bring someone with him that morning. Counsel argues that the evidence was not clear as to who fired first and there was conflicting evidence as to who was sitting where in the vehicle. She provides that two casings fired by the same gun were found in different areas of the crime scene. Counsel alleges that several witnesses' testimony conflicted with each other and the evidence. She argues that defendant did not have a specific intent to kill, he acted in self-defense, and he fled the scene in fear for his life.[29]

The State asserts that there was sufficient evidence to prove second degree murder and to establish that defendant did not act in self-defense. It contends it proved defendant's identity as the shooter and that he had the specific intent to kill or inflict great bodily harm. The State maintains that video surveillance footage showed that defendant fired multiple shots with a Glock into Mr. Brown's car at close range. The State avers that it refuted any assertion that defendant believed his life was in imminent danger and that deadly force was necessary. It argues the

---

[29] The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal under La. C.Cr.P. art. 821. *State v. Aguilar*, 23-34 (La. App. 5 Cir. 11/15/23), 376 So.3d 1105, 1108. While a motion for post-verdict judgment of acquittal was not filed here, the failure to do so does not preclude appellate review of sufficiency of the evidence. *See State v. Romero*, 23-376 (La. App. 5 Cir. 2/28/24), 383 So.3d 1045, 1052 n.6, *writ denied*, 24-404 (La. 10/8/24), -- So.3d --, 2024 WL 4440851.

Here, defendant filed a Motion for New Trial seeking that the trial court set aside the guilty verdict and order a new trial pursuant to La. C.Cr.P. art. 851. In that motion, which the trial court denied, defendant argued in relevant part that the verdict was contrary to the law and the evidence, and there was insufficient evidence to prove specific intent to kill or cause bodily injury or that defendant did not act in self-defense.

evidence indicates that Mr. Brown did not move towards his gun or provoke defendant, and Ms. Swanigan only fired a gun after defendant shot the victim.

The constitutional standard for sufficiency of the evidence is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find that the State proved all of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Gassenberger*, 23-148 (La. App. 5 Cir. 12/20/23), 378 So.3d 820, 829. This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *Aguilar*, *supra*. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *Id*. Further, a reviewing court errs by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *Id*. As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt, but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *State v. Gassenberger*, *supra*.

In its determination of whether any rational trier of fact would have found the defendant guilty, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *State v. Hutchinson*, 22-536 (La. App. 5 Cir. 8/18/23), 370 So.3d 769, 781, *writ denied*, 23-1296 (La. 2/27/24), 379 So.3d 662. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *Id*. Thus,

in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Tate*, 22-570 (La. App. 5 Cir. 6/21/23), 368 So.3d 236, 244.

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Johnson*, 23-273 (La. App. 5 Cir. 2/28/24), 382 So.3d 1129, 1134. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides: "[A]ssuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test from the *Jackson* standard, but rather provides a helpful basis for determining the existence of reasonable doubt. *Id.*

The reviewing court is not required to determine whether a defendant's suggested hypothesis of innocence offers an exculpatory explanation of events. Rather, the reviewing court must evaluate the evidence in the light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Key*, 23-167 (La. App. 5 Cir. 12/27/23), 379 So.3d 96, 112-13.

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where a key issue is identification, the State is required to negate any reasonable probability of misidentification to carry its burden of proof. *State v. Key*, 379 So.3d at 113.

In this case, defendant was convicted of second degree murder, which La. R.S. 14:30.1 defines as the killing of a human being when the offender: (1) has a specific intent to kill or inflict great bodily harm; or (2) is engaged in the

perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or inflict great bodily harm. *See State v. Sly*, 23-60 (La. App. 5 Cir. 11/2/23), 376 So.3d 1047, 1072, *writ denied*, 23-1588 (La. 4/23/24), 383 So.3d 608. Here, the jury was informed that it could convict defendant under the specific intent theory of second degree murder and was instructed as to self-defense. On appeal, defendant argues he lacked the necessary specific intent and that the shooting was in self-defense.

Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Such a state of mind can be formed in an instant. *State v. Sly*, 376 So.3d at 1073. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant, as well as the extent and severity of the victim's injuries. Louisiana courts have found that aiming a lethal weapon and discharging it at close range in the direction of a victim is indicative of a specific intent to kill. *Id.* The determination of whether the requisite intent is present is a question of fact, and a review of the correctness of this determination is guided by the *Jackson* standard. *Id.*

When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Tate*, 368 So.3d at 245. A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1). The fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18; *State v. Tate*, *supra*.

The person who is the aggressor or who brings on a difficulty cannot claim self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know his desire is to withdraw and discontinue the conflict. La. R.S. 14:21. In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. *State v. Tate*, *supra*.

Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Tate*, *supra*. The determination of a defendant's culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. The jury is the ultimate fact-finder in determining whether the State negated self-defense beyond a reasonable doubt. *Id.*

Applying these legal principles to the evidence established in this case, a rational trier of fact could have found under the *Jackson* standard that the State carried its burden of proving beyond a reasonable doubt that defendant acted with specific intent to kill or inflict great bodily harm and did not act in self-defense.

Positive identification by only one witness is sufficient to support a conviction. *State v. Robertson*, 22-363 (La. App. 5 Cir. 3/29/23), 360 So.3d 582, 591. Ms. Swanigan testified that she and Mr. Brown were going to meet "Tut." When she was later shown a set of photographs, she identified defendant, whom she knew as "Tut," as the shooter. She also identified defendant as the shooter in open court. She told Mr. Brown's sister immediately following the shooting that "Tut" killed him.

Additional evidence beyond Ms. Swanigan's identification establishes that defendant was the shooter. Detective Ducote explained that there were three Apple IDs associated with defendant's phone: Glockboytut5600@gmail.com, Glockboy5600@icloud.com, and Kemharris2001@icloud.com. The name of the phone was "Tut's iPhone." The Instagram account was associated with Kemonhoward@gmail.com. Further, the library's surveillance video footage shows defendant wearing a black hoodie with white insignia and blue shoes. Photographs on defendant's phone showed him wearing the same distinctive shoes and jacket as seen in the library's footage. As such, the evidence firmly established that defendant, also known as "Tut," was the shooter.

Communications between defendant and Mr. Brown, as evidenced by the phone records, further showed that defendant was meeting Mr. Brown. They communicated over Instagram to locate each other near the library, and defendant stated he was walking near apartments immediately around the corner from the scene of the murder. Their messages also established that prior to meeting up, defendant knew Ms. Swanigan was with Mr. Brown. Ms. Swanigan testified that Mr. Brown even showed defendant during their video call that she was with him. As such, defendant knew Ms. Swanigan and Mr. Brown were together and still chose to meet them. Further, after the shooting, defendant deleted the messages.

The evidence clearly showed that defendant shot three times first and Ms. Swanigan fired only once in return. The surveillance footage from the library reflects that three shots were heard quickly and a final shot was heard after. The surveillance footage also shows Ms. Swanigan hanging out of the driver's window pointing a gun immediately before the car crashed.

The ballistics report supports a finding that defendant shot Mr. Brown three times prior to any other gunfire. Ms. Terrebonne testified that there was one fired cartridge and one unfired cartridge at the scene that matched the gun found under

the vehicle—the same gun Ms. Swanigan admitted to firing and kicking under the vehicle. At the scene, there were two other cartridges that were fired from the same gun, which was consistent with a Glock. The projectiles recovered from Mr. Brown's body were also consistent with a Glock.[30]

The jury heard evidence that defendant was associated with a Glock firearm. "Glock" appears in his Instagram name and e-mail address. Photographs admitted into evidence show defendant holding a Glock, establishing that he had one in his possession near the time and place of the murder. Specifically, Sergeant Zeagler testified that in a photograph taken four days before the murder, defendant held a Glock handgun with an extended magazine. Detective Ducote agreed the photograph showed defendant holding a Glock. Sergeant Zeagler identified another photograph posted to defendant's Instagram account the night before the murder of defendant holding a Glock with an extended magazine. Dr. Troxclair said that stippling indicated that one wound was from an intermediate range of two to three feet away, and the others were distant wounds.

Video and testimony established that defendant ran away from the scene. Defendant's flight from the scene after the shooting may be viewed as inconsistent with a theory of justifiable homicide. *See State v. Leach*, 22-194 (La. App. 5 Cir. 12/28/22), 356 So.3d 531, 543. A defendant's flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. *State v. Lopez*, 23-335 (La. App. 5 Cir. 8/21/24), -- So.3d --, 2024 WL 3885502.

The evidence does not support defendant's claim of self-defense. The evidence does not show that defendant was in reasonable fear for his life. Defendant and Mr. Brown appeared to be meeting to trade guns. While there was

---

[30] The murder weapon was never recovered.

evidence that they had a prior disagreement, their disagreement appears to have been resolved approximately two months before the shooting. There was no evidence that Mr. Brown had a gun in his hand at the time he was shot. Dr. Troxclair agreed that the shots to Mr. Brown's arm were consistent with a bent arm, and the wounds to the right hand could be consistent with someone holding a gun. However, she said that if Mr. Brown's injury occurred while holding a gun, the gun in his hand would have been damaged by the same bullet that hit his hand. Ms. Terrebonne testified that the Springfield firearm found at the scene did not have any damage. Ms. Swanigan testified that at the time of the injury, Mr. Brown was smoking. The jury could have found that Mr. Brown's arm was bent because he was smoking and not because he was holding a gun.

Further, defendant and the victim were meeting at a public place during a busy time. Defendant knew Ms. Swanigan was with defendant before he saw their car and still decided to meet them. He confirmed in person that Ms. Swanigan was with Mr. Brown as he approached the passenger side of the vehicle and then went around the car to the driver's side. Trial testimony from Ms. Swanigan showed that the interaction at that time was friendly. The evidence shows that defendant was on foot while Mr. Brown and Ms. Swanigan were in the car. There was no evidence to suggest that defendant was unable to avoid initially approaching them or that he could not have fled prior to firing three times.

The jury heard all of the evidence and was instructed as to self-defense. The jury is the ultimate fact-finder in determining whether the State negated self-defense beyond a reasonable doubt. *State v. Sly*, 376 So.3d at 1075. On review, we find that a reasonable jury could have rationally concluded that defendant had the specific intent to kill or inflict great bodily harm and that the State proved beyond a reasonable doubt that the killing was not justified, as defendant did not

have a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER TWO

### *Denial of Motion for Mistrial*

In brief, defense counsel also argues that the trial court erred in denying the defense's motion for a mistrial after there was an improper admission of a recorded conversation between defendant and his mother when they got to the police station. She contends that the video was a backdoor way to emphasize that defendant did not give the police a statement. Counsel states the video had no other evidentiary value. She argues that defendant was denied his right to a fair trial and the prejudice was so insurmountable that it cannot be considered harmless error.

The State avers that the judge did not err in denying the mistrial. It contends that the video was relevant to defendant's self-defense assertion, as defendant never stated in the recording that he acted in self-defense. The State notes that Sergeant Zeagler was not asked and did not testify that defendant invoked his right to be silent. It argues that the recording did not emphasize that defendant invoked his right to remain silent. It asserts that the recording did not result in substantial prejudice. The State argues that even if a mistrial was warranted, the admission of the recording was harmless error.

At trial, after *voir dire*, the prosecutor stated that the State intended to introduce a recorded conversation between defendant and his mother. She said it was probative or relevant because defendant's mother called him "Tut." Defense counsel objected and argued that it would broadcast that he invoked his right to counsel. Defense counsel asserted that defendant was brought to the station and left in an interview room to talk to his mother, and there was no further statement. Counsel argued that the conversation with defendant's mother conveyed that it did not go any farther because defendant refused to talk. The prosecutor said that the

portion of the conversation the State would play begins with Sergeant Zeagler bringing in defendant's mother, advising defendant of his rights, and then saying he would give defendant time to talk to his mother. She stated that after Sergeant Zeagler left, defendant and his mother talked. Then, when the sergeant returns, defendant's mother invokes his rights.

Defense counsel contended that she was not sure what the State was referring to regarding its notice of intent to use the confession or statement. She objected to the use of a recorded statement wherein defendant invoked his right to counsel because it would highlight that he did not give a statement. Defense counsel stated that she would have tried to suppress it, but she did not know the State was considering using it. The prosecutor explained that defendant did not give an inculpatory statement during a custodial interrogation and the State did not intend to introduce evidence of defendant invoking his rights.

The judge ruled that any portion of the recording wherein defendant invokes his rights would not be allowed. The judge further ruled that only the portion of the conversation between defendant and his mother would be allowed.

In defendant's Motion for New Trial, he contended that the judge erred in admitting the recording of his conversation with his mother over defense counsel's objection and in denying defendant's request for a mistrial when the conversation was played for the jury. He argued that it exposed the jury to improper comment on defendant's right not to speak with the officers. Defense counsel argued that the recording contained comments that the officers wanted to question him. He argued that when no testimony regarding the officers' questioning defendant was forthcoming, the jury was left to conclude that defendant refused to speak with investigators.

Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it

impossible for the defendant to obtain a fair trial, or when authorized by Articles 770 or 771. La. C.Cr.P. art. 775. Mistrial is a drastic remedy, which should be used only upon a clear showing of prejudice by the defendant; a mere possibility of prejudice is not sufficient. *State v. Lane*, 20-137 (La. App. 5 Cir. 12/23/20), 309 So.3d 886, 907, *writ denied*, 21-100 (La. 4/27/21), 314 So.3d 836. "Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion." *State v. Mejia*, 23-161 (La. App. 5 Cir. 11/29/23), 377 So.3d 860, 878, *writ denied*, 23-1722 (La. 5/29/24), 385 So.3d 705. The standard to judge whether a mistrial should have been granted is whether the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. *Id.*

In *Doyle v. Ohio*, 426 U.S. 610, 620, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that reference to a defendant's silence at the time of his arrest and after he has received *Miranda* warnings, for impeachment purposes, violates the defendant's due process rights. The Supreme Court explained: "[E]very post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested ... it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. at 617-18, 96 S.Ct. at 2244-45. A reference to a defendant's post-arrest silence in violation of *Doyle* is subject to a harmless error analysis. *State v. Delanueville*, 11-379 (La. App. 5 Cir. 2/14/12), 90 So.3d 15, 23, *writ denied*, 12-630 (La. 9/21/12), 98 So.3d 325. An error is harmless when the verdict actually rendered was surely unattributable to the error. *Id.*

However, not every mention of a defendant's post-arrest silence is prohibited by *Doyle*. *State v. Hicks*, 17-696 (La. App. 5 Cir. 10/17/18), 258 So.3d

24-KA-145          26

1039, 1052, *writ denied*, 18-1938 (La. 4/15/19), 267 So.3d 1123. *Doyle* only condemns the use of a defendant's silence at the time of arrest and after *Miranda* warnings for impeachment purposes. *Id*. at 1050. A prosecutor cannot make reference to the fact that an accused exercised his constitutional right to remain silent, after he had been advised of the right, solely to ascribe a guilty meaning to his silence or to undermine, by inference, an exculpatory version related by the accused, for the first time at trial. *Id*. In contrast, an oblique and obscure reference to a defendant's post-arrest silence, where the examination does not stress the right to remain silent or attempt to elicit testimony regarding the defendant's failure to respond to police questioning, does not constitute reversible error. *State v. Longo*, 08-405 (La. App. 5 Cir. 1/27/09), 8 So.3d 666, 672. A brief reference to a defendant's post-arrest silence does not mandate a mistrial or reversal when the trial as a whole was fairly conducted, the proof of guilt is strong, and the prosecution made no use of the silence for impeachment purposes. *Id*.

In *State v. Hicks*, *supra*, the defendant argued that the trial court erred by denying his motion for a mistrial based on a witness's reference to his exercise of his post-arrest right to remain silent. At trial, defense counsel objected to an officer notifying the jury of the defendant exercising his right to remain silent. She also asked for a mistrial, arguing that the defendant's Fifth Amendment privilege was violated by telling the jury that he exercised his right to remain silent. The trial judge refused to grant a mistrial, but offered to admonish the jury, which defense counsel declined. This Court found that Article 770 did not apply because it does not apply to a state witness, and there was no showing that the prosecutor purposefully introduced the complained of evidence. *Id*. at 1051.

This Court found in *State v. Hicks* that the trial court did not err in denying the defendant's motion for a mistrial. This Court found it was unclear that the jury would infer from the witness's statement that he "attempted to speak with them"

and that the defendant had invoked his right to remain silent. The witness testified that he sat down with the defendant and a co-defendant and attempted to speak to them, but not another co-defendant. This Court found that the statement would not necessarily indicate to the jury that the defendant refused to speak to the witness. This Court concluded that where, as here, the trial as a whole was fairly conducted, the proof of guilt was strong, and the prosecution made no use of the silence for impeachment purposes, the brief, vague reference to the defendant's post-arrest silence did not mandate a mistrial or reversal. *Id*. at 1052.

In *State v. Longo*, *supra*, the defendant argued that during trial, the State made two impermissible references to his post-arrest silence. He argued the trial court erred in refusing to grant his two motions for a mistrial on this basis and in refusing to admonish the jury. As to the first request for a mistrial, this Court found that it did not appear that the reference to the defendant's post-arrest silence was used to ascribe a guilty meaning to the silence or for impeachment purposes. Rather, the State's line of questioning directed to the investigating officer appeared designed to elicit from the officer a description of how the police investigation culminated. The reference to the defendant's post-arrest silence arose at the close of the officer's testimony and was more a way of exploring how the interrogation was concluded, rather than an effort to call attention to the silence. Thus, the trial court did not err in denying the defendant's motion for a mistrial at that point.[31] This Court explained that the record showed that the trial, as a whole, was conducted fairly and the defendant's guilt was overwhelming. This Court concluded that under those circumstances, a mistrial was not warranted. While the defendant was entitled to an admonishment for the prosecutor's improper remark,

---

[31] This Court went on to find that as to the second reference to the defendant's post-arrest silence, *Doyle* was violated. This Court applied a harmless error analysis and found that the verdict was surely unattributable to the error. *State v. Longo*, 8 So.3d at 673-74.

he did not request it. Nonetheless, the failure of a trial court to admonish the jury is considered harmless error when there is considerable evidence of the defendant's guilt. *Id*. at 674.

Here, the publishing of the video between defendant and his mother to the jury did not warrant a mistrial. Defendant's mother's statement that the police wanted to talk to him does not necessarily indicate to the jury that defendant refused to speak to the police. Reviewing the entire record, the trial as a whole was fairly conducted, the proof of guilt was strong, and the prosecution did not use the silence for impeachment purposes. The statement that the police wanted to talk to defendant, without the State then presenting an actual statement by defendant or evidence that he invoked his right to remain silent, did not mandate a mistrial or reversal. The record does not indicate that defendant suffered substantial prejudice that deprived him of any reasonable expectation of a fair trial.

In any event, any inference that defendant may have invoked his right to remain silent was harmless. The State presented a wealth of evidence that defendant shot and killed Mr. Brown, and the verdict was surely unattributable to any potential error regarding the admission of the recorded conversation between defendant and his mother. As such, the trial court did not abuse its discretion in denying the motion for a mistrial. This assignment of error is without merit.

### *PRO SE* ASSIGNMENT OF ERROR NUMBER ONE

#### *Ineffective Assistance of Counsel*

In his *pro se* brief, defendant asserts that trial counsel was so blatantly ineffective that the State or the trial judge should have intervened. He argues that counsel's performance was not the result of strategic choices and she acted with a reckless disregard for defendant's best interest. He contends that she disregarded evidence that defendant was not the shooter. He argues that he was never present at the scene and maintains his innocence. He avers that given Ms. Swanigan's

testimony that the victim shielded her, she could not see the shooter.  Defendant also argues that his counsel pursued a self-defense claim without his agreement. He reiterates that he did not agree to a self-defense claim and that he explicitly communicated his disagreement.  He argues that counsel failed to properly cross-examine witnesses regarding Ms. Swanigan's position in the car.[32]

Under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution, a defendant is entitled to effective assistance of counsel.  *State v. McMillan*, 23-317 (La. App. 5 Cir. 12/27/23), 379 So.3d 788, 798-99, *writ denied*, 24-131 (La. 9/4/24), 391 So.3d 1057.  To prove ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was deficient, that is, that the performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  An error is considered prejudicial if it was so serious as to deprive the defendant of a fair trial, or "a trial whose result is reliable."  *Id*.  To prove prejudice, the defendant must demonstrate that, but for counsel's unprofessional conduct, the outcome of the trial would have been different.  *State v. Robinson*, 23-277 (La. App. 5 Cir. 6/28/23), 368 So.3d 737, 742, *writ denied*, 23-1042 (La. 12/5/23), 373 So.3d 979 (relying on *Strickland*).

To prevail, the accused must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1040.  An alleged error that is within the ambit of trial strategy does not establish ineffective

---

[32] Defendant included with his *pro se* brief a paper signed by him and hand-dated October 16, 2023.  In the document, defendant insists he was not present at the offense and was not the shooter.  It acknowledges that he was informed that a self-defense claim was in his best interest, but that he was refusing to take this advice.  This document does not appear in the record.  The court of appeal has no authority to consider matters attached to briefs that are not found in the appellate record.  *State v. Sterling*, 13-287 (La. App. 5 Cir. 12/12/13), 131 So.3d 295, 306 n.6, *writ denied*, 14-65 (La. 8/25/14), 147 So.3d 698.

assistance of counsel because "opinions may differ on the advisability of such a tactic." *State v. McKinney*, 19-380 (La. App. 5 Cir. 12/26/19), 289 So.3d 153, 162. Counsel's decisions as to which questions to ask on cross-examination generally form a part of trial strategy. *See State v. Broadway*, 17-825 (La. 9/21/18), 252 So.3d 878, 883. Any inquiry into the effectiveness of counsel must be specific to the facts of the case and must take into consideration the counsel's perspective at the time. *Id.* The Sixth Amendment does not guarantee errorless counsel or counsel judged ineffective by hindsight. *State v. Robinson*, 22-310 (La. App. 5 Cir. 4/12/23), 361 So.3d 1107, 1121.

Generally, an ineffective assistance of counsel claim is most appropriately addressed through an application for post-conviction relief filed in the district court, where a full evidentiary hearing can be conducted, if necessary and appropriate, rather than by direct appeal. *State v. Gatson*, *supra*. However, when the record contains sufficient evidence to rule on the merits of the claim and the issue is properly raised in an assignment of error on appeal, it may be addressed in the interest of judicial economy. *Id.* If, on the other hand, the record does not contain sufficient evidence to fully explore a claim of ineffective assistance of counsel, the claim should be relegated to post-conviction proceedings under La. C.Cr.P. arts. 924-930.8. *Id.*

Part of defendant's argument here appears to relate to sufficiency of the evidence, which was addressed in Assignment of Error Number One. Defendant also argues that trial counsel was ineffective because she pursued a strategy of self-defense.

This Court has held that ineffectiveness of counsel relating to trial strategy cannot be determined by review of the record on appeal, but rather such a claim must be asserted by application for post-conviction relief where the issue can be considered through an evidentiary hearing to determine, among other things, the

defense strategy and whether the defendant himself was aware of the strategy and acquiesced in it. *State v. Starks*, 20-429 (La. App. 5 Cir. 11/3/21), 330 So.3d 1192, 1199. The allegations of ineffective assistance of counsel for decisions relating to investigation, preparation, and strategy can only be sufficiently investigated in an evidentiary hearing where the defendant could present evidence beyond that contained in the record. *Id.*

In light of the evidence in the record, it appears that a claim of self-defense was a reasonable defense. However, defendant asserts that he explicitly disagreed with this strategy, indicates that counsel disregarded evidence of his innocence, and states counsel was deficient in cross-examining witnesses. Because these arguments pertain to trial strategy and matters not in the record, the matter is more properly addressed on post-conviction relief at an evidentiary hearing, if warranted. Thus, we decline to address the merits of the claim of ineffective assistance of counsel at this time.

## ERRORS PATENT REVIEW

The record was reviewed for errors patent according to La. C.Cr.P. art. 920, *State v. Oliveaux*, 312 So.2d 337 (La. 1975), and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). The review reveals no errors patent in this case.

## DECREE

For the foregoing reasons, defendant's conviction and sentence are affirmed.

## AFFIRMED

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 18, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 24-KA-145

## E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN D. ENRIGHT, JR. (DISTRICT JUDGE)
JULIET L. CLARK (APPELLEE)          MONIQUE D. NOLAN (APPELLEE)          THOMAS J. BUTLER (APPELLEE)
JANE L. BEEBE (APPELLANT)

## MAILED
KEMON J. HOWARD #784655
(APPELLANT)
LOUISIANA STATE PENITENTIARY
CAMP D FALCON
ANGOLA, LA 70712

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
BRITTANY BECKNER (APPELLEE)
CAROLYN CHKAUTOVICH (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053